**Nos. 23-1665, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, 23-1780 (Consolidated)**

# United States Court of Appeals for the Third Circuit

IN RE: BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,
*Debtor,*

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH PA., *et al.*,
*Appellants,*

v.

BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, *et al.*,
*Appellees.*

Appeal from the United States District Court
for the District of Delaware (No. 22-cv-01237)

## OPENING BRIEF OF CERTAIN INSURERS

Deirdre M. Richards
FINEMAN KREKSTEIN
& HARRIS PC
1300 N. King Street
Wilmington, DE 19801
(302) 538-8331

Susan N.K. Gummow
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601

Theodore J. Boutrous Jr.
Richard J. Doren
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

Michael A. Rosenthal
James Hallowell
Seth M. Rokosky
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

Joseph T. Baio
Christopher J. St. Jeanos
Mitchell J. Auslander
Charles Dean Cording
Patricia O. Haynes
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Additional Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

Ronald P. Schiller
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400

*Counsel for Arch Insurance Company*

Kathleen K. Kerns
POST & SCHELL, P.C.
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Phone: (215) 587-1000

George R. Calhoun
IFRAH PLLC
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC  20006
Phone:  (202) 840-8758

*Counsel for Argonaut Insurance Company and Colony Insurance Company*

Michael J. Joyce
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 388-1944

Kevin Coughlin
Lorraine Armenti
Michael Hrinewski
COUGHLIN MIDLIGE &
GARLAND, LLP
350 Mount Kemble Avenue, PO
Box 1917
Morristown, NJ 07962
Telephone: (973) 267-0058

John M. Flynn
Britton C. Lewis
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC 27401
Telephone: (336) 478-1146

*Counsel for Arrowood
Indemnity Company*

William H. White Jr.
KIERNAN TREBACH LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 712-7000

John E.W. Baay II
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800

Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710

Laura McNally, Esq.
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155

David Christian, Esq.
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282

*Counsel for Continental Insurance
Company and Columbia Casualty
Company*

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036

New Orleans, LA 70139
Telephone: (504) 561-0400

*Counsel for*
*Gemini Insurance Company*


Konrad R. Krebs
CLYDE & CO US LLP
340 Mt. Kemble Ave, Suite 300
Morristown, New Jersey 07960
Telephone: (973) 210-6705

Alexander E. Potente
CLYDE & CO US LLP
150 California Street
15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800

David Christian
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282


Bruce W. McCullough
BODELL BOVE, LLC
1225 N. King St., Suite 1000
Wilmington, DE 19801-3250
Telephone: (302) 655-6749

*Counsel for Great American*
*Assurance Company f/k/a*
*Agricultural Insurance Company,*
*Great American E&S Insurance*
*Company f/k/a Agricultural Excess*

Phone: (202) 719-7000

*Counsel for General Star Indemnity*
*Company*


Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400

Lloyd A. Gura
Pamela J. Minetto
MOUND COTTON WOLLAN &
GREENGRASS LLP
One New York Plaza 44th Floor
New York, NY 10004
Telephone: (212) 804-4282

*Counsel for Indian Harbor*
*Insurance Company, on behalf of*
*itself and as successor in interest to*
*Catlin Specialty Insurance*
*Company*

*and Surplus Insurance Company,*
*and Great American E&S*
*Insurance Company*

Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
CHOATE, HALL & STEWART
LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000

Kim V. Marrkand
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000

R. Karl Hill
SEITZ, VAN OGTROP & GREEN,
P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600

*Counsel to Liberty Mutual*
*Insurance Company, The Ohio*
*Casualty Insurance Company,*
*Liberty Insurance Underwriters,*
*Inc., and Liberty Surplus*
*Insurance Corporation*

Stephen M. Miller
Carl N. Kunz, III
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500

Marla S. Benedek
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone:  (302) 295-2024

*Counsel for Traders and Pacific*
*Insurance Company, Endurance*
*American Specialty Insurance*
*Company, and Endurance*
*American Insurance Company*

Louis J. Rizzo, Jr., Esquire
REGER RIZZO & DARNALL LLP
1521 Concord Pike
Brandywine Plaza West Suite 305
Wilmington DE  19803
Telephone: (302) 477-7100

*Counsel for Travelers Casualty and*
*Surety Company, Inc. (f/k/a Aetna*
*Casualty & Surety Company), St.*
*Paul Surplus Lines Insurance*
*Company and Gulf Insurance*
*Company ("Travelers")*

Wilmington, Delaware 19801
Telephone: (302) 888-6800

*Counsel for Old Republic*
*Insurance Company*

# CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned Certain Insurers make the following disclosures:

## AIG

National Union Fire Insurance Company of Pittsburgh, PA (f/k/a National Union Fire Insurance Company of Pittsburg, Pa. and successor in interest to Audubon Indemnity Company, Audubon Insurance Company, National Union Fire Insurance Company of Louisiana, and also Landmark Insurance Company), Lexington Insurance Company (successor in interest to Chartis Select Insurance Company (f/k/a AIG Excess Liability Insurance Company Ltd. and also Starr Excess Liability Insurance Company Ltd.)), and the Insurance Company of the State of Pennsylvania are direct, wholly owned subsidiaries of AIG Property Casualty U.S., Inc., which is a wholly owned subsidiary of AIG Property Casualty Inc., which is a wholly owned subsidiary of American International Group, Inc., which is a publicly held corporation.  With the exception of Vanguard Group, Inc., which has stated in its public filings that it is the beneficial owner of more than 10% of American

i

International Group, Inc. common stock, no other company has an interest of 10% or more in American International Group, Inc.

## Arch

Arch Insurance Company is a wholly-owned subsidiary of Arch Reinsurance Company, whose ultimate parent is Arch Capital Group Ltd., a publicly traded company.

## Argonaut and Colony

The parent company of Argonaut Insurance Company is Argo Group US, Inc., an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation. The parent company of Colony Insurance Company is Argonaut Insurance Company, an indirect subsidiary of Argo Group International Holdings, Ltd., which is a publicly traded corporation.

## Arrowood

Arrowood Indemnity Company, formerly known as Royal Indemnity Company, individually and as successor-in-interest to Royal Insurance Company of America ("Arrowood"), is a United States holding company organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina, and it is 100% owned by

Arrowpoint Group, Inc., which is 100% owned by Arrowpoint Capital Corp. Neither Arrowpoint Group, Inc. nor Arrowpoint Capital Corp. is a publicly held company, nor is there any publicly held corporation or other corporation that owns 10% or more of Arrowpoint Capital Corp.'s stock.

## CNA

The Continental Insurance Company, a Pennsylvania insurance company is wholly owned by Continental Casualty Company. Continental Casualty Company is wholly owned by The Continental Corporation. The Continental Corporation is wholly owned by CNA Financial Corporation. CNA Financial Corporation has issued shares to the public. Loews Corporation owns the majority of the common stock of CNA Financial Corporation and is publicly traded. No other corporation owns 10% or more of the common stock of CNA Financial Corporation.

Columbia Casualty Company, an Illinois insurance company is wholly owned by Continental Casualty Company. Continental Casualty Company is wholly owned by The Continental Corporation. The Continental Corporation is wholly owned by CNA Financial Corporation. CNA Financial Corporation has issued shares to the public. Loews

Corporation owns the majority of the common stock of CNA Financial Corporation and is publicly traded. No other corporation owns 10% or more of the common stock of CNA Financial Corporation.

## Gemini

Gemini Insurance Company is ultimately owned by W.R. Berkley Corporation, which is a publicly-traded company.

## General Star

General Star Indemnity Company is a wholly-owned subsidiary of General Reinsurance Corporation. GenRe Corporation is the parent corporation of General Reinsurance Corporation, and Berkshire Hathaway, Inc. is the parent corporation of GenRe Corporation. Berkshire Hathaway, Inc. owns 10% or more of General Star Indemnity Company.

## Great American

Great American Assurance Company, f/k/a Agricultural Insurance Company; Great American E&S Insurance Company, f/k/a Agricultural Excess and Surplus Insurance Company; and Great American E&S Insurance Company hereby make the following corporate disclosure statement: Great American E&S Insurance Company is a wholly-owned

subsidiary of Great American Insurance Company. Great American Assurance Company is also a wholly owned subsidiary of Great American Insurance Company. Great American Insurance Company is a wholly-owned subsidiary of American Financial Group, Inc. Shares of American Financial Group, Inc. are publicly traded on the New York Stock Exchange under the symbol AFG.

## Indian Harbor

Indian Harbor Insurance Company ("IHIC"), is a Delaware Corporation with its principal place of business located in Stamford, Connecticut. IHIC is a direct subsidiary of XL Specialty Insurance Company, and is an indirect subsidiary of Greenwich Insurance Company, X.L. America, Inc., XL Financial Holdings (Ireland) Limited, XL Bermuda Ltd, XL Group Ltd, and AXA SA. The ultimate indirect parent of IHIC is AXA SA, a company domiciled in France. AXA SA is a publicly traded company.

## Liberty

The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation state that 100% of the stock of each entity is owned by Liberty Mutual

Insurance Company. Liberty Mutual Group Inc. owns 100% of the stock of Liberty Mutual Insurance Company. No public company owns 10% or more of the stock of The Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., Liberty Surplus Insurance Corporation, or Liberty Mutual Insurance Company.

## Old Republic

Old Republic Insurance Company is owned entirely by Old Republic General Insurance Group, Inc., which is owned entirely by Old Republic International Corporation, a publicly held corporation (NYSE: ORI). No publicly held corporation owns ten percent or more of the stock of Old Republic International Corporation.

## Traders & Pacific Insurance Co., Endurance American Specialty Insurance Co., and Endurance American Insurance Co.

Traders and Pacific Insurance Company changed its name to Endurance American Specialty Insurance Company in 2006. Endurance American Specialty Insurance Company is wholly owned by Endurance American Insurance Company. In turn, Endurance American Insurance Company is a wholly owned subsidiary of Endurance Assurance Corporation, which is a wholly owned subsidiary of Endurance U.S. Holdings Corp. Further, Endurance U.S. Holdings Corp. is a wholly

owned subsidiary of Endurance Specialty Insurance Ltd. (Bermuda), which is a wholly owned subsidiary of Sompo International Holdings Ltd. (Bermuda).   Sompo International Holdings Ltd. is a wholly owned subsidiary of Sompo Japan Insurance Inc. (Japan), which is a wholly owned subsidiary of Sompo Holdings, Inc. (Japan), a holding company headquartered in Japan.   No entity owns 10% or more of the stock of Sompo Holdings, Inc.

## **Travelers**

Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company are 100% owned by Travelers Casualty and Surety Company, which is 100% owned by Travelers Group Holdings Inc., which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company in the corporate family. No individual or corporation owns 10% or more of the stock of The Travelers Companies, Inc.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ xi

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 9

ISSUES PRESENTED ......................................................................... 9

STATEMENT OF RELATED CASES AND PROCEEDINGS ................. 9

STATEMENT OF THE CASE ........................................................... 10

    I.    BSA's Operations and Sexual Abuse Claims ......................... 10

    II.   BSA's Insurance Program ..................................................... 10

    III.  Bankruptcy Filing and Proofs of Claims ............................. 12

    IV.  The Plan and Trust Distribution Procedures ...................... 14

        A.   Drafting and Negotiation of the Plan and Trust
            Distribution Procedures ................................................ 14

        B.   Relevant Provisions of the Final Plan and Trust
            Distribution Procedures ................................................ 19

            1.   Assignment of Insurance Coverage ....................... 19
            2.   Claims Matrix ....................................................... 21

    V.   The Confirmation Order ...................................................... 24

    VI.  District Court Opinion ......................................................... 24

STANDARD OF REVIEW ................................................................ 26

SUMMARY OF ARGUMENT ........................................................... 27

ARGUMENT .................................................................................. 29

    I.    The Confirmation Order and Plan Impair the
        Contractual Rights of the Certain Insurers .......................... 29

A. The Rights and Obligations of BSA and the Certain Insurers Under the Policies Cannot Change After Bankruptcy. ...................................................... 29

B. The Plan Does Not Protect The Certain Insurers' Contractual Rights or Recognize the Contractual Duties Created in the Policies. ....................................... 31

 1. The Courts Below Disregarded Third Circuit Law in Approving a Plan That Does Not Preserve the Certain Insurers' Rights. ......................................... 31

 2. The Plan Language Purporting To Preserve the Certain Insurers' Rights Undermines Them. ......... 41

 3. The Protective Language Originally Proposed by BSA Must Be Added Back to the Plan. ................... 48

 4. The Relief Sought by the Certain Insurers Does Not Require Unraveling the Plan. ................................ 51

II. The Plan Approved at Confirmation Was Not Proposed by BSA in Good Faith in Its Treatment of the Certain Insurers. ................................................................................ 52

A. The Bankruptcy Court Failed to Properly Consider the Interests of the Certain Insurers. .............................. 54

B. The Plan Was Not Proposed in Good Faith as to the Certain Insurers. .......................................................... 56

C. The Plan Creates a Moral Hazard that Must Be Addressed to Meet the Good Faith Requirement. .......... 57

CONCLUSION ...................................................................... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 15375 Mem'l Corp. v. BEPCO, L.P.*,
589 F.3d 605 (3d Cir. 2009) ........................................................ 5, 53

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) ...................................................... 52

*In re Am Home Mortg. Holdings*,
402 B.R. 87 (Bankr. D. Del. 2009) ......................................... 30, 32, 34

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
311 U.S. 138 (1940) ............................................................................ 53, 60

*In re American Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) ................................. 6, 52, 53, 54, 55, 63

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .............................................................................. 59

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) .............................................................................. 59

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004) ..................................................... passim

*In re Coram Healthcare Corporation*,
271 B.R. 228 (Bankr. D. Del. 2001) .................................................... 53

*In re Crippin*,
877 F.2d 594 (7th Cir. 1989) ............................................................... 29

*In re Fed.-Mogul Glob. Inc.*,
684 F.3d 355 (3d Cir. 2012) ............................................................... 54

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*,
209 F.3d 252 (3d Cir. 2000) ............................................................... 33

*In re Global Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011) .......................................... 1, 39, 40, 54, 59

*In re Heritage Highgate, Inc.*,
679 F.3d 132 (3d Cir. 2012) ................................................................... 27

*Ind. State Police Pension Tr. v. Chrysler LLC*
*(In re Chrysler LLC)*,
576 F.3d 108 (2d Cir. 2009) ................................................................... 32

*Landy v. Fed. Deposit Ins. Corp.*,
486 F.2d 139 (3d Cir. 1973) ................................................................... 42

*In re LTL Mgmt. LLC*,
64 F. 4th 84 (3d. Cir. 2023) ......................................... 5, 27, 52, 53, 55

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
247 F.3d 44 (3d Cir. 2001) ..................................................................... 34

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1653 (2019) .............................................................. 29, 35, 39

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ................................................................... 60

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) ................................................................... 51

*Reserves Dev. LLC v. Crystal Props., LLC*,
986 A.2d 362 (Del. 2009) ....................................................................... 34

*In re SGL Carbon Corp.*,
200 F.3d 154 (3d Cir. 1999) ............................................................. 4, 52,

*Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*,
872 F.2d 36 (3d. Cir. 1989) .............................................................. 29, 30

*Spyglass Media Grp. v. Bruce Cohen Prods.*
*(In re Weinstein Co. Holdings LLC)*,
997 F.3d 497 (3d Cir. 2021) ............................................................ 2, 30, 33

*In re Tribune Media Co.*,
  799 F.3d 272 (3d Cir. 2015) ............................................................ 52

*In re W.R. Grace & Co.*,
  475 B.R. 34 (Bankr. D. Del. 2012) ................................................ 53

**Statutes**

11 U.S.C. § 1129(a)(3) .............................................................. 4, 52

**Rules**

Fed. R. Evid. 201(b) ...................................................................... 42

Fed. R. Evid. 201(d) ...................................................................... 42

# PRELIMINARY STATEMENT

Boy Scouts of America's ("BSA") plan of reorganization (the "Plan") fails to expressly preserve the contractual rights of the undersigned Certain Insurers in violation of federal law, which mandates including "language [that] broadly preserves insurers' pre-petition rights under the subject insurance policies." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 217 (3d Cir. 2004). The Certain Insurers, major but involuntary participants in the BSA bankruptcy, face a Plan that risks binding them to awards issued to claimants and that fails to preserve the Certain Insurers' pre-petition rights under the subject insurance policies. That significant defect must be remediated for the Plan to move forward.

This Court has repeatedly endorsed the principle of "insurance neutrality"—that the rights and duties of parties to insurance contracts, like any other contracts, do not expand or diminish by the happenstance of bankruptcy. *See id.* at 218; *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011). Treating "insurance neutrality" not as a substantive right but as a mere standing concept, however, both the district court and the bankruptcy court approved a Plan that fails to expressly preserve the rights of the Certain Insurers. They refused to

require that the policies be transferred *cum onere*—meaning assignment of the policies with both the benefits and the burdens—from BSA to the Settlement Trust. *See Spyglass Media Grp. v. Bruce Cohen Prods. (In re Weinstein Co. Holdings LLC)*, 997 F.3d 497, 505 (3d Cir. 2021). Instead, they allowed BSA to transfer rights to coverage without expressly requiring the assignment of the policies as a whole, including BSA's obligations, contractual limitations, and exclusions.

The result is a Plan that contains no clear statement that the Certain Insurers' pre-petition contractual rights are preserved. Contrary to Third Circuit law, it says just the opposite—that the Certain Insurers' rights are "subject to the Plan and Confirmation Order." (A. 1017 (TDPs, Art. V.C).) The district court interpreted this language to be "clear" in preserving the Certain Insurers' rights. (A. 117.) At the same time, that court stated that federal law may abrogate the same rights and obligations, without saying which, if any, remain. (A. 176.) Both courts below invited "coverage courts" around the country to "interpret the Plan, the [Trust Distribution Procedures] or any confirmation order" in resolving disputes over the meaning of this language for the Certain Insurers' contractual rights, even though only the policies themselves—

not the Plan and Confirmation Order—should be interpreted in resolving coverage disputes.  (*Id.*; A. 744.)

The Trustee is already seeking to use the Plan to override the Certain Insurers' contractual defenses to coverage.  Just last week, the Trustee filed a coverage action in Texas federal court that relied on, and misconstrued, the bankruptcy proceeding and the Plan to seek a declaration that the Certain Insurers are liable for the full amount of the Abuse Claims, subject ***only*** to applicable attachment points and limits of liability, and should be collaterally estopped from raising their contractual coverage defenses.  (Compl. ¶¶ 119, 121.)  In so doing, the Trustee has made clear her intent to rely on the lack of clarity in the Plan to impair the Certain Insurers' contractual rights in subsequent coverage litigation.  This lawsuit further underscores that the meaning of the bankruptcy plan, confirmed by a bankruptcy court, cannot be left to interpretation by courts deciding coverage disputes.  It is the responsibility of the bankruptcy court to ensure that the plan it confirms appropriately preserves the relevant contracts under applicable law.

Earlier proposed versions of the Plan included provisions that expressly protected the rights and defenses available to the Certain

Insurers.  (*See, e.g.*, A. 7708-7711 (TDPs, Arts. 2.1, 7.2. 10.1).)  Those provisions—which expressly state that the Trust's awards will have no collateral estoppel, *res judicata*, or preclusive effect on the Certain Insurers—were removed at the insistence of a coalition of claimants' lawyers.  These deletions left the Certain Insurers' rights "subject to" a Plan that establishes streamlined procedures for resolving abuse claims, while failing to assign the policies in their entirety, as has been done in all mass tort bankruptcies of which Appellants are aware, and failing to preserve and protect the Certain Insurers' pre-petition rights to defend against and investigate claims and consent to any settlements.  To ensure the protection of those pre-petition rights, the removed provisions must be added back to the Plan.

The Plan also was not proposed in good faith in its treatment of the Certain Insurers.  *See* 11 U.S.C. § 1129(a)(3).  Good faith is an equitable concept, rooted in the promise of fair treatment for all affected parties drawn into a bankruptcy reorganization.  Fair treatment requires the debtor to propose a plan that preserves the rights of insurers and contractual obligations of the Settlement Trust.  *See In re SGL Carbon Corp.*, 200 F.3d 154, 161 (3d Cir. 1999) (A good faith plan "is fair to rights

and interests of the parties affected.") (internal quotation marks omitted)); *In re LTL Mgmt. LLC*, 64 F. 4th 84, 100 (3d Cir. 2023) ("[T]he culminating determination of whether [the] facts support a conclusion of good faith gets plenary review as 'essentially[] a conclusion of law.'" (quoting *In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 616 (3d Cir. 2009))).

The need for the express preservation of those rights and obligations is particularly critical in this case. Unlike in many other mass tort settlement trusts, most of the funding obligations fall on insurance carriers and not on BSA, other responsible wrongdoers, or the reorganized entity. Yet BSA deleted a provision from the "Purpose" section of the Plan making clear that the Trust Distribution Procedures "are intended to balance the interests" of affected parties, including reorganized BSA, the other Protected Parties, the Abuse Victims, and the Certain Insurers. (A. 7708 (TDPs, Art. 2.1).) This provision too must be re-inserted.

Further, the nature of the Trustee's duties is troubling where, as here, there has been a 50-fold increase in the number of claims since the establishment of the bar date; it is estimated that 65% of the filed claims

are governed by state laws where the statutes of limitations render the claims untimely; a significant proportion of the claims are likely "fraudulent"; and base matrix values will need to be scaled down by as much as **90%** for most claims to properly align with BSA's pre-bankruptcy settlement practices. But the Plan does not require the Trustee to consider any of this. Instead, the Trustee may, but is not required to, "consider any further limitation on Abuse Claimants' recovery in the tort system." (A. 1029 (TDPs, Art. VIII.D.ii).)

Moreover, the Plan significantly alters the relationship between the former policyholder, BSA, and the insurers that provided coverage for BSA for decades. The Plan provides that unlike BSA pre-petition, the Trustee owes fiduciary duties to the claimants. In doing so, the Plan creates a conflict of interest and moral hazard,[1] where the Trustee is duty-bound to compensate claimants and minimize available defenses to the detriment of the Certain Insurers. *See, e.g., In re American Cap. Equip., LLC*, 688 F.3d 145, 158-59 (3d Cir. 2012) (plan could not satisfy

---

[1] A. 739 n.658 ("A moral hazard is 'the possibility that an insured, once the insurance company is paying for claims or losses, . . . may have less incentive to prevent loss or less incentive to limit the size of losses or claims once they occur.'" (quoting A. 3990 (Harrington).)

6

the good faith requirement where debtor was "financially incentivized" to sabotage its own defenses to the detriment of its insurers). Both courts recognized that the Certain Insurers' contractual rights protect against such conflicts of interest and mitigate the risk of moral hazard in the non-bankruptcy setting. The material change in the relationship between the Certain Insurers and their insured only increases the conflict and enhances the need for a plan that contains express and unambiguous language that preserves the Certain Insurers' contractual rights, makes clear that their policies must be enforced per their terms, and assures that the Trustee must balance their interests along with those of other affected parties.

The Certain Insurers seek only minimal, but critical, modifications to the Plan to ensure that their rights are preserved:

- First, the Court should eliminate the language in Article VI.C that renders the Certain Insurers' rights "subject to the terms of the Plan and the Confirmation Order" and applicable law, make clear that the policies should be assigned in their entirety, and add back the two provisions (Articles 7.2 and

10.1) making clear that the Plan in no way affects, impairs, or prejudices the Certain Insurers' contractual rights.

- Second, the Court should restore the "Purpose" provision that recognizes the Trustee's obligation to balance the rights of the Certain Insurers along with reorganized BSA, the other Protected Parties, and the Abuse Claimants in administering the Trust.

- Third, in determining whether a claimant is entitled to compensation and, if so, in what amount, the Trustee should be ***required***, not just permitted, to "consider any further limitation on Abuse Claimants' recovery in the tort system." (A. 1029 (TDPs, Art. VIII.D.ii).)

These modifications are necessary to protect the Certain Insurers from impairment of their rights and to ameliorate the moral hazard that the Plan creates. *Combustion Eng'g*, 391 F.3d at 215. At the same time, the relief would leave undisturbed the provisions of the Plan that serve legitimate Bankruptcy Code purposes, such as rehabilitating the debtor and compensating its claimants.

# JURISDICTIONAL STATEMENT

The Certain Insurers appeal from a final order of the district court entered on March 28, 2023, affirming the order of the bankruptcy court entered on July 29, 2022. The Certain Insurers filed timely notices of appeal on April 10, 2023. The District Court had subject-matter jurisdiction over the appeal under 28 U.S.C. § 158(a), and this Court has jurisdiction under 28 U.S.C. §§ 158(d) and 1291.

# ISSUES PRESENTED

1.   Whether the Plan impermissibly impairs the contractual rights of the Certain Insurers. (*See* A. 113-120.)

2.   Whether the Plan was proposed in good faith as required by the Bankruptcy Code, 11 U.S.C. § 1129(a)(3). (*See* A. 172-196.)

# STATEMENT OF RELATED CASES AND PROCEEDINGS

By Clerk's Order, the following appeals have been procedurally consolidated: Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677, 23-1678, & 23-1780. (ECF No. 21.) Other appeals before this Court arising out of the same case include Nos. 21-1792 and 21-2035.

## STATEMENT OF THE CASE

### I.   BSA's Operations and Sexual Abuse Claims

The bankruptcy court recounted BSA's history and structure in detail. (A. 514-519.)  BSA, a non-profit, is the national organization, and scouting is delivered through approximately 250 Local Councils that recruit Chartered Organizations such as faith-based institutions and civic organizations that sponsor scouting units.  (A. 514, 516-518.)

Before bankruptcy, BSA increasingly became the subject of sexual abuse claims.  (A. 520-522, 533.)  At the time of BSA's bankruptcy filing, BSA had defended approximately 275 lawsuits relating to sexual abuse, and attorneys for alleged abuse victims asserted approximately 1,400 additional claims.  (A. 533.)  With substantial financial contributions from insurers, including some of the Certain Insurers and other insurers that have now settled, BSA spent $150 million defending and settling these claims, with most of that sum spent on "a small number of high value claims." (A. 572.)

### II.   BSA's Insurance Program

BSA has maintained commercial liability insurance since at least 1935.  (A. 523-529.)  These commercial insurance contracts provide certain protections for damages arising from liability for bodily injury

and property damage, subject to various terms, conditions, and exclusions. (*See, e.g.*, A. 527-528 (citing two such policies).)

These policies include several important rights and obligations of the parties, which help reduce the moral hazard associated with insurance policies (A. 739):

- **Defense Rights**: Defense rights provide insurers with the right to associate in the defense and investigate claims, as well as the right to defend lawsuits and make any settlements they deem expedient. (*Id.*)

- **Cooperation Obligations**: Cooperation obligations require the insured to assist and cooperate with the insurer in the investigation, defense, and settlement of claims, including by providing relevant materials and testimony. (*Id.*)

- **Consent/No Action Obligations**: Consent obligations require the insured to obtain the insurer's written consent to any settlements and "no-action" conditions obligate the insured to obtain the insurer's consent to a settlement by providing that no action lies against the insurer for breach unless a trial results in a judgment against the insured or the claimant, insured, and insurer have agreed in writing to settle the claim. (*Id.*)

- **Assignment Obligations**: Assignment obligations require the insured to obtain its insurers' consent to an assignment of the contract. (*Id.*)

- **Defenses to and Exclusions from Coverage**: Defenses and exclusions set forth in these policies provide that coverage is not available for, among other things, damages arising from alleged conduct that was not an accident or for punitive damages and in some instances, damages arising from claims

11

for sexual abuse.  (*See, e.g.*, A. 529-532, 23082-23094, 21628-21643.)

- **Arbitration Clauses:** Certain policies also provide that disputes over coverage pursuant to those policies must be resolved in arbitration.  (*See, e.g.*, A. 21591, 21614.)

## III.    Bankruptcy Filing and Proofs of Claims

On February 18, 2020, BSA filed a Chapter 11 petition and proposed a plan of reorganization that included a victims compensation trust.  (A. 533-534.)  At the time of the filing, there were approximately 1,700 sexual abuse claims against BSA and its affiliates.   By the November 16, 2020 bar date, approximately 82,000 unique claims were filed.  (A. 536.)

Following the filing, claimants' attorneys engaged in a "massive advertising campaign" to target potential claimants.[2]  (A. 535-536.)  In response to these efforts, BSA (which had not yet agreed to the settlement amount it would pay the claimants) moved the court for an order to prevent false and misleading statements, describing the advertisements as "inflammatory" and noting the "confusion resulting from the inconsistent information between the Debtors' Court-approved notices

---

[2]  The bankruptcy court found that in "many instances," claimants' lawyers submitted proofs of claim that they did not personally review or about which they did not speak with the client.  (A. 723-724.)

and these law firm advertisements." (A. 7598-7599, 7617; *see* A. 536.) After an evidentiary hearing, the bankruptcy court granted that motion and found that at least nine law firms made "false and misleading statements" in advertisements, including statements that: (1) survivors may remain anonymous; (2) described the value of any potential compensation trust; and (3) survivors will never have to be deposed, appear in court, or prove their claims. (A. 21205-21206, 21208; *see* A. 536.)

BSA's witnesses testified to the several ways in which the claims filed differ from the pre-petition sexual abuse claims. According to BSA, at least 85% of the claims face such legal hurdles that, but for the bankruptcy, they would never have been filed. (A. 2791-2793 (Bates), 2931 (Bates).) These claims are "typically older . . . the highest frequency of them come from periods 50, 60 years ago" and only about 33% identify an abuser's full name. (A. 2676-2678 (Bates).) 87% of claims involve single abusers, which is the "mirror" opposite of claims filed pre-petition. (A. 2932-2933 (Bates); *see* A. 2681 (Murray).) And for 98%, the "link between the abuser and institutional responsibility is tenuous." (A. 2931 (Bates).)

IV.    The Plan and Trust Distribution Procedures

BSA's plan of reorganization (A. 856-1008 (the "Plan")) creates a trust to benefit abuse survivors, through which all Abuse Claims against the Debtors and Related Non-Debtor Entities will be channeled.  (A. 539-540.)   The Trustee administers those claims in accordance with the Settlement Trust Agreement ("STA") and Trust Distribution Procedures (the "TDPs").  (A. 1091-1133 (STA), 1009-1055 (TDPs), 549.)  The Trustee is selected and overseen by the Settlement Trust Advisory Committee (the "STAC"), comprised of claimants' lawyers earning contingency fees based on Trust awards, and the Future Claimants Representative ("FCR"), who represents future claimants in this and other mass tort cases.  (A. 535, 549, 3944-3955 (Slater), 6800-6803 (Patton).)

A.    Drafting and Negotiation of the Plan and Trust Distribution Procedures

The first draft of the TDPs filed by BSA on April 13, 2021—before BSA conducted negotiations with claimants' counsel—included the following provisions expressly designed to protect the Certain Insurers' rights:

- **Article 2.1**: "[The TDPs] are intended to balance the interests of Reorganized BSA and the other Protected Parties, holders of Abuse Claims, and the Non-Settling Insurance Companies."  (A. 7708 (TDPs, Art. 2.1).)

14

- **Article 7.2**: "**Nothing in the [TDPs] (a) shall affect, impair, or prejudice the rights and defenses of the Non-Settling Insurance Companies in any manner**; (b) shall in any way operate to, or have the effect of, impairing or having any *res judicata*, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurance Policy in any respect; or (c) shall otherwise determine the applicability or non-applicability of any provision of any non-Settling Insurance Policy and any such rights and obligations shall be determined under Non-Settling Insurance Policies and applicable law. ..."    (A. 7709-7710 (TDPs, Art. 7.1) (emphasis added).)

- **Article 10.1**: "Notwithstanding any other provision of these [TDPs], **a decision by the Settlement Trust to pay or not to pay any Submitted Abuse Claim shall not be used in, be admissible as evidence in, binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against any other entity other than the Settlement Trust**. Notwithstanding any other provision of these [TDPs], the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim."    (A. 7711 (TDPs, Art. 10.1) (emphasis added).)

The Coalition of Abused Scouts for Justice, an ad hoc group representing 65,000 to 70,000 of the 82,000 claimants, and the FCR objected to the draft with these provisions.  (A. 3864, 2152 (Bates), 7307-7311; *see* A. 727-728.)  As one attorney explained, these attorneys were seeking the "holy grail" that they "have been chasing for many years and

[that] has never been approved"—claim determinations made to their satisfaction that "will result in individual awards that will be binding on the insurance carriers."  (A. 23754; *see, e.g.*, A. 4608-4609 (Amala) (strategy was to get binding TDPs and then leverage precedent in other bankruptcies that could be used against insurers).)

BSA was aware of the goal of claimants' counsel to use the bankruptcy process to prejudice insurers.  At a hearing in May 2021, BSA's counsel acknowledged that the draft plan's "treatment of insurance" gets "to the [heart] of what is happening in this reorganization case," but warned that "[r]emoving that insurance neutrality language and setting this court or the Delaware District Court up for either a binding estimation battle or a binding trust distribution procedure battle," as the claimants' lawyers were seeking, "is setting us up for ***the most epic battle these courts have ever seen*** between plaintiff lawyers on the one hand and insurers on the other hand."  (A. 8624, 8626) (emphasis added).)

At the same time, BSA preferred a plan that would include a channeling injunction and the broadest possible releases from the abuse claimants, including not only releases for BSA, but also for its Local

Councils and Chartered Organizations. (A. 1402-1404 (Desai), 5743-5754.) The result was a requirement that BSA secure the "overwhelming" support and vote of the abuse claimants and their attorneys, in contrast to the Certain Insurers who had no right to vote.

BSA therefore began negotiating with a "particular focus on reaching a consensus with the Abuse Claimants' Representatives." (A. 6674 (Azer), 6804-6805 (Patton); *see* A. 2221 (Azer).) On June 5, 2021, BSA and claimants' lawyers agreed that BSA's contribution to the Trust would be fixed at no more than $250 million in exchange for broad global releases for BSA and the Local Councils. (A. 1480-1482 (Desai); *see, e.g.*, A. 23736.) On June 18, 2021, BSA filed the Third Amended Plan, which removed the insurer protective provisions quoted above and included language proposed by claimants' lawyers that the Certain Insurers' rights were "subject to the Plan and Confirmation Order" and applicable law, purporting to abrogate such protections through confirmation of the plan. (*See* A. 8862 (Art. V.B), 6179, 8867 (Redline, Art. V.B).)

BSA sent the Certain Insurers the new draft of the TDPs on June 25, 2021. (A. 23578-23580.) The Certain Insurers responded that the draft lacked basic protections of the rights that they had contracted for

17

under the insurance policies.  (*See* A. 23581-23586; *see also* A. 2295-2296, 2300-2301, 6690-6691 (Azer).)  In response, BSA stated that engaging with the Certain Insurers would "scuttle the deal between the debtors and the TCC, coalition, and FCR," and "effectively require the debtors to negotiate a new set of TDPs."  (A. 2422, 2164-2166, 2296, 2301-2302 (Azer); *see* A. 24842-24826.)  The protections sought by the Certain Insurers were again removed from the draft by the Coalition and were not included in the final confirmed Plan.  (A. 728.)

At the same time, to implement their goal of binding insurers, the Coalition drafted certain proposed findings, including that:

- "the Plan Documents (including the Plan) and the Confirmation Order shall be binding on all parties in interest consistent with applicable legal doctrines, including the doctrine of *res judicata* and collateral estoppel, and section 1141 of the Bankruptcy Code (and related legal authority)" (A. 685);

- the procedures and criteria in the TDPs "are appropriate and provide for a fair and equitable settlement of Abuse Claims" (*id.*); and

- "the Base Matrix Values in the Trust Distribution Procedures subject to adjustment based on Aggravating Scaling Factors and Mitigating Scaling Factors (each as defined in the Trust Distribution Procedures), are based on and consistent with the Debtors' historical abuse settlements and litigation outcomes" (A. 686).

18

BSA did not include these proposed findings initially, but did incorporate similar findings into the Fourth Amended Plan following further negotiations with the Coalition, which was submitted to the bankruptcy court for confirmation. (*See* A. 9025-9027.) The FCR testified that these findings were "important" to "limit the insurers' ability" to re-litigate matters such as "the appropriateness of the values set forth in the TDPs or the processes by which the TDPs were negotiated and developed." (A. 6824-6826 (Patton).) The bankruptcy court would ultimately confirm the Third Modified Fifth Amended Plan following additional changes discussed below. (A. 11194.)

B.    <u>Relevant Provisions of the Final Plan and Trust Distribution Procedures</u>

1.    Assignment of Insurance Coverage

The purpose of the TDPs is, among other things, to "hold, preserve, maximize and administer the Settlement Trust Assets," and to "obtain insurance coverage" for allowed Insured Abuse Claims. (A. 1010 (TDPs, Art. I.A).)

The Trustee is required to act as the fiduciary to the Trust, which "shall succeed to all of the rights and standing of the Debtors with respect to the Aggregate Settlement Consideration in its capacity as a trust

19

administering assets for the benefit of the Beneficiaries." (A. 1093 (STA, § 1.6(a)); *see* A. 718 ("In her role, [the Trustee] owes a fiduciary duty to the Settlement Trust for the benefit of Beneficiaries, that is all holders of Abuse Claims.").)

The Plan provides for an "Insurance Assignment," which is "the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, and (d) ***all other rights, claims, benefits, or Causes of Action*** of the Debtors, Related Non-Debtor Entities, Local Councils, or Contributing Chartered Organizations under or with respect to the Abuse Insurance Policies ***(but not the policies themselves)*** . . . ." (A. 890-891 (Plan, ¶ 157 (emphasis added).) The TDPs further state that the "Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order," and the Settlement Trust "has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (***but not***

*the policies themselves*) in accordance with the Bankruptcy Code."
(A. 1017 (TDPs, Art. V.C (emphasis added)).)

Furthermore, the TDPs state that "[n]othing in these TDP shall
modify, amend, or supplement, or be interpreted as modifying, amending,
or supplementing, the terms of any Insurance Policy or rights and
obligations under any Insurance Policy assigned to the Settlement Trust
to the extent such rights and obligations are otherwise available under
applicable law *and subject to the Plan and Confirmation Order*."
(*Id.* (emphasis added).)

### 2.    Claims Matrix

The TDPs require the Trustee to determine the compensation for
each Allowed Abuse Claim according to the Claims Matrix.  (A. 549-550.)

To receive compensation, Abuse Claimants must complete and sign
under oath a questionnaire, produce all documents related to the Abuse
Claims, cooperate in a written and/or oral examination under oath if
requested by the Trustee, and sign a release form.  (A. 1018-1023 (TDPs,
Art. VII), 550-551.)  The Trustee evaluates the validity of the claims
based first on the Initial Evaluation Criteria and then on the General
Criteria, which requires a showing of alleged abuse based on a

preponderance of the evidence. (A. 1018-1023 (TDPs, Art. VII).) The claimant is not required to prove that BSA was negligent or would be found liable, only that BSA "may bear legal responsibility." (A. 1020 (TDPs, Art. VII.C.ii), 551.)

If the Trustee determines that the Claim satisfies the General Criteria, BSA's liability is valued under the Claims Matrix, which sets forth six tiers based on the severity of the abuse. (A. 1023-1025 (TDPs, Art. VIII.A), 551-552.) All claimants who satisfy the General Criteria receive some amount of compensation. Each tier has a Base Matrix Value, ranging from $3,500 to $600,000, and a Maximum Matrix Value, ranging from $8,500 to $2,700,000. (A. 552-553.) The Trustee begins with the Base Matrix Value for each tier and then makes adjustments using Aggravating or Mitigating Scaling Factors. (A. 553.)

One Mitigating Scaling Factor that the Trustee may, but is not required, to consider is "any further limitations on the Abuse Claimant's recovery in the tort system." (A. 1029 (TDPs, Art. VIII.D.ii).) Another Mitigating Scaling Factor is whether the claim is time-barred. (A. 1045-1046 (TDPs, Sched. 1), 747.) In determining the applicable statute of limitations, the Trustee has the discretion to choose between "the

jurisdiction where the Abuse Claim was pending on the Petition Date . . . or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law." (A. 1017 (TDPs, Art. V.E).) The TDPs also do not include a requirement that the Trustee scale down the Base Matrix Values by approximately 90%, which BSA's own expert testified would be necessary to properly value claims. (A. 2941 (Bates).)

The Trustee must administer the Trust in consultation with the STAC and FCR, and the Trustee can be removed for cause by the vote of two-thirds of the STAC with the agreement of the FCR. (A. 1013-1014 (TDPs, Art. III), 1107 (STA, § 5.2(c)).) The TDPs grant the Trustee significant discretion (subject to the oversight of the STAC and FCR). For example, the Trustee may, but is not required to, "disclose information, documents, or other materials . . . reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage[.]" (A. 1011 (TDPs, Art. II).) And the Trustee may "reasonably interpret[]" any provisions of the TDPs "in such a manner that is consistent with the overall purpose and intent of these

TDP without further notice to or action, order, or approval of the Bankruptcy Court." (A. 1013-1014 (TDPs, Art. III).)

## V.    The Confirmation Order

On July 29, 2022, the bankruptcy court issued an opinion approving the Plan subject to certain modifications, resulting in the Modified Fifth Amended Plan.

The bankruptcy court removed the proposed findings that the Plan and Confirmation Order shall be binding on all parties, the procedures and criteria in the TDPs "are appropriate and provide for a fair and equitable settlement of Abuse Claims," and the Claims Values resulting from the Claims Matrix in the TDPs are "based on and consistent with the Debtors' historical abuse settlements and litigation outcomes." (A. 685-697.) The bankruptcy court, however, refused to alter language in the Plan making the Certain Insurers' contract rights "subject to" the Plan and Confirmation Order, stating that it "will not anticipate how an insurance coverage court will interpret the Plan, the TDP or any confirmation order that may be entered." (A. 744.)

## VI.    District Court Opinion

In the district court, the Certain Insurers argued that the Plan fails to sufficiently preserve their rights because it makes them "subject to"

the Plan and Confirmation Order. (A. 15185-15195.) The Certain Insurers also argued that the bankruptcy court's conclusion that the Plan could be confirmed because it preserved insurers' ability to raise defenses in coverage disputes was incorrect because it ignored applicable law and disregarded the harm resulting from the Certain Insurers' inflated exposure under the Plan. (A. 15197.)

The district court rejected these arguments, finding "no error in the Bankruptcy Court's conclusion that the Insurance Assignment does not impermissibly abrogate Certain Insurers' contracts." (A. 119.) The district court concluded that the Plan did not abrogate the obligations under the policies, and that Certain Insurers' "real concern" of later breach of the policies was "speculative." (A. 116-117.) The district court determined that the "subject to" language is "clear" in preserving the Certain Insurers' contractual rights. (A. 117-119.)

The Certain Insurers also argued that the bankruptcy court had erred in confirming a Plan that was not proposed in good faith. (A. 15168-15183.) In doing so, the Certain Insurers did not challenge the factual findings made by the bankruptcy court, but rather argued that the relevant factual findings, taken together, do not meet the good faith

requirement, which must be reviewed *de novo*. (A. 19560-19561, 19719-19720.) The Certain Insurers argued that substantial evidence precluded the legal conclusion that BSA proposed a plan in good faith as to the Certain Insurers. (A. 15170-15173, 15176-15183.)

The district court rejected the Certain Insurers' arguments, stating that clear-error review was appropriate because the "Certain Insurers are not really arguing for a different conclusion based on a totality of the circumstances approach," but instead are seeking "different underlying factual findings to support a different conclusion." (A. 165 (quoting A. 19780-19781).) The district court accordingly found "no evidence demonstrating clear error in the factual findings underlying the bankruptcy court's good faith determination" and, alternatively, no error under a *de novo* review. (A. 195-196.) In reaching this conclusion, the district court focused on the aspects of the Plan that furthered the interests of BSA and did not address the Plan's impact on the Certain Insurers' pre-petition contract rights. (*See* A. 113-119.)

## STANDARD OF REVIEW

"In reviewing the Bankruptcy Court's determinations, [the Court] exercise[s] the same standard of review as did the District Court.

Accordingly, the Bankruptcy Court's findings of fact are reviewed only for clear error, while legal determinations are reviewed *de novo*." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012) (citations omitted). Whether the Plan impermissibly impairs the contractual rights of the Certain Insurers and the culminating determination of whether the facts support a conclusion of good faith are legal determinations subject to *de novo* review. *See LTL*, 64 F.4th at 99.

## SUMMARY OF ARGUMENT

The Plan impermissibly fails to preserve rights and obligations in the Certain Insurers' contracts. Both courts below failed to account for the foundational precept of bankruptcy law that contractual rights cannot be expanded or contracted by happenstance of bankruptcy. As a result, the Plan purports to transfer BSA's insurance-related rights without the concomitant obligations that bind the insured or the rights that protect the insurers. Although the district court concluded that the Plan "clearly" preserves the contracts, neither the Plan language nor the court's opinion achieves that result. Both permit the Trustee to argue in coverage proceedings—indeed, as the Trustee is now doing in her recently filed coverage lawsuit—that only the rights, not the obligations

27

under the policies were assigned as a result of the confirmed Plan, which was the claimants' admitted intent when they drafted the Plan language. This Court should reverse and require clear language in the Plan preserving all provisions in the implicated insurance contracts.

The Plan also cannot be confirmed in its present form because it was not proposed in good faith in its treatment of the Certain Insurers. Under the Plan, the major anticipated funding sources for the Trust are the Certain Insurers as opposed to BSA, other responsible wrongdoers, and the reorganized entity, as is typically the case. At the same time, the relationship between the Certain Insurers and the entity with whom they contracted has been irrevocably altered, to the detriment of the Certain Insurers. The Certain Insurers are "affected parties" that must be treated fairly and equitably in any plan of reorganization. By granting the requested relief, the Court will restore the contractual relationship between BSA's successor and its insurers, protect the coverage rights and defenses of the Certain Insurers, reorganize BSA, and compensate its claimants.

# ARGUMENT

I. <u>The Confirmation Order and Plan Impair the Contractual Rights of the Certain Insurers</u>.

A. <u>The Rights and Obligations of BSA and the Certain Insurers Under the Policies Cannot Change After Bankruptcy</u>.

It is a foundational precept of bankruptcy law that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1653, 1663 (2019). "Whatever limitation[s] on the debtor's property [apply] outside of bankruptcy . . . appl[y] inside of bankruptcy as well." *Id.* And rights and obligations under a contract cannot expand or contract "by happenstance of bankruptcy." *Id.*

Rather, bankruptcy law provides the debtor "with the same rights and defenses" under a pre-petition contract as those held by the debtor before the bankruptcy. *Combustion Eng'g*, 391 F.3d at 245 n.66. Bankruptcy courts "do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms" (*In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989)), and contractual rights cannot be assigned without their concomitant obligations (*see Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989)

(acknowledging "the general principle that a debtor may not reject a contract but maintain its benefits")).

Therefore, executory contracts must be assigned *cum onere* or not at all. *See id.* And where, as here, a contract is considered to be non-executory, the debtor may assign a contract provided that the assignee fulfills the remaining obligations due under that contract. *Spyglass Media*, 997 F.3d at 505. Regardless of whether a contract is executory or non-executory, and assigned under Section 365 or 363 of the Bankruptcy Code, respectively, the assignment does not eliminate contractual duties of the debtor. "[T]he *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract[.]" *In re Am. Home Mortg. Holdings*, 402 B.R. 87, 98 (Bankr. D. Del. 2009).

Beyond the *cum onere* requirement, a plan may not operate to modify or impair an insurer's rights under its pre-petition insurance policies. Sometimes referred to as "insurance neutrality," this principle means that a plan that impermissibly abrogates insurance contracts is not confirmable. *See Combustion Eng'g*, 391 F.3d at 218. Insurance neutrality requires preserving insurers' rights and mandates that a plan

include "language [that] broadly preserves insurers' pre-petition rights under the subject insurance policies and settlements." *Id.* at 217.

B.  The Plan Does Not Protect The Certain Insurers' Contractual Rights or Recognize the Contractual Duties Created in the Policies.

1.  The Courts Below Disregarded Third Circuit Law in Approving a Plan That Does Not Preserve the Certain Insurers' Rights.

Both lower courts recognized that the Plan may not abrogate BSA's obligations as policyholder under the insurance policies.  (A. 115-117, 761-766.)  But the courts committed two legal errors that undermined that conclusion.  First, neither court required the assignment of policies *cum onere*.  As a result, they confirmed a Plan that purports to transfer BSA's **rights** to the Trust, without an explicit and simultaneous transfer of its **obligations** under the policies.  (A. 113-116, 762-65.)  Second, both courts held that the Plan need not be "neutral" with respect to the Certain Insurers' pre-petition rights.  (A. 191, 729.)

In refusing to include language in the Plan that would clarify that the policies are transferred *cum onere*, the bankruptcy court seized upon dicta in *American Home Mortgage* that "[u]nder the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/or* obligations under section 363 of the Bankruptcy Code[.]"

31

(A. 764 (quoting *Am. Home Mortg.*, 402 B.R. at 93) (emphasis added by bankruptcy court).)    But the bankruptcy court in *American Home Mortgage* specifically held that non-executory contracts must be transferred *cum onere*.  402 B.R. at 98.  And the bankruptcy court below recognized (but disregarded) this outcome, acknowledging that the "rights and/or obligations" dicta from *American Home Mortgage* "appears to clash with the statement a non-executory contract must be taken *cum onere*."  (A. 764.)  Nevertheless, the court refused to require transfer of the insurance policies *cum onere* on the basis of *American Home Mortgage* and its analysis was cited approvingly by the district court.  (A. 115.)

A rule that contractual rights can be assigned to a settlement trust under Section 363 while contractual obligations are abrogated would have far-reaching implications for the bankruptcy process.  Section 363 is regularly employed in mass tort bankruptcies to assign insurance policies and effectuate the sale of assets and assignment of many types of commercial contracts, not just insurance policies.  *See, e.g.*, *Ind. State Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 115 (2d Cir. 2009) ("§ 363(b) asset sales have become common practice in large-scale corporate bankruptcies.").    The remedy that the Certain

Insurers seek here will make clear that the Bankruptcy Code does not permit a debtor to abrogate obligations contained in its pre-petition contracts by purporting to assign only its contractual rights.

Recognizing that bankruptcy laws cannot be used to rewrite contracts, this Court has never permitted a bankruptcy court to sever contractual rights from contractual obligations and permit a partial transfer of contract rights in a bankruptcy plan. Instead, it has held that the Bankruptcy Code requires the opposite—regardless of whether a contract is executory or non-executory, the contract must be transferred *cum onere*, and the buyer must comply with all *post*-assignment obligations. *See Spyglass Media*, 997 F.3d at 505; *see also, e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252 (3d Cir. 2000).[3] It is important for this Court to make clear this rule applies here.

---

[3] This result follows even though the insurance policies were deemed non-executory contracts. In *Spyglass Media*, this Court affirmed a ruling by the bankruptcy court explaining the limited difference between assignment of a non-executory contract under Section 363 versus an executory contract under Section 365: "[T]he difference … is ***simply*** that a sale under 363 does not obligate the buyer to cure . . . prior payment defaults that the debtor would have to, otherwise, be obligated to make" before the transfer. *Lantern Entm't LLC v. Bruce Cohen Prods.* (*In re The Weinstein Co. Holdings LLC*), Adv. Case No. 18-50924, Dkt. No. 44, at 137:7-11 (emphasis added). The bankruptcy court squarely ruled that

Coverage disputes between the Settlement Trust and the insurers have already commenced by the Trustee's filing a lawsuit against the Certain Insurers in Texas, and uncertainty in this regard is likely to result in fractured and inconsistent rulings in that and future disputes in this and other cases.

The bankruptcy court disregarded this *cum onere* rule in favor of the "common law principle" that "there is a distinction between the assignment of rights under a contract, the delegation of duties under a contract, and the transfer of rights and obligations under a contract." (A. 764.)   But under the common law, contractual obligations must remain with the assignor or transfer to the assignee, absent consent of the obligee (here, the Certain Insurers).   *See, e.g.*, *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 370 (Del. 2009).   In short, the common law does not abrogate contractual obligations simply because an assignment has occurred.   *See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir. 2001) ("Insofar as an assignment touches on the obligations of the other party to the

---

the *cum onere* principle "applies in both 363, as well as 365."   *Id.* at 136:15-16; *see Am. Home Mortg.*, 402 B.R. at 92-93.

underlying contract, the assignee simply moves into the shoes of the assignor." (quotation marks omitted)).

The courts below further compounded their error by erroneously concluding that a plan need not be "neutral" with respect to an insurer's contractual rights. Because this Court's decision in *Combustion Engineering* (along with its decision in *Global Industrial*) arose in the standing context, the lower courts dismissed "insurance neutrality" as a mere standing concept. According to the courts below: "Neither of these decisions guarantee an insurance company an 'insurance neutral plan,' rather these decisions recognize that if a plan is not 'insurance neutral,' insurance companies have standing (at either the bankruptcy or the appellate level, as applicable) to be heard." (A. 763; *see* A. 191.)

But insurance neutrality is rooted in the bedrock principle that contractual rights and duties do not expand or contract by the "happenstance of bankruptcy." *Mission Prod.*, 139 S. Ct. at 1663. In *Combustion Engineering*, a case involving the channeling of asbestos claims to a post-confirmation trust, this Court endorsed the principle of insurance neutrality and applied it to modify plan language in much the same way that the Certain Insurers urge here. 391 F.3d at 218.

35

During the *Combustion Engineering* bankruptcy court proceedings, in response to insurer objections that the plan failed to preserve their rights and, accordingly, they should have been given an opportunity to vote on the plan, the bankruptcy court added a "super-preemptory" provision to the plan that expressly preserved the insurers' rights:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

*Id.* at 209.

Given the addition of this language, the bankruptcy court held that the objecting insurers did not have bankruptcy standing (*i.e.*, a right to vote on plan confirmation) because their rights were not impaired. *Id.* On appeal, the district court narrowed the super-preemptory provision, limiting it to the insurer's "contractual rights, if any, *in respect of any claims (as defined in Section 101(5) of the Bankruptcy Code)*." *Id.* at 212 (emphasis added by Third Circuit). This amendment responded to

arguments made by the claimants' representatives that the prior reference to "rights" instead of "claims" went further than required to ensure that the insurers' claims in the bankruptcy were unimpaired pursuant to Section 1124(1) of the Bankruptcy Code. *Id.* at 211-12.

On appeal, this Court reversed the district court's narrowing of the super-preemptory provision. While agreeing that the district court's modified language more closely tracked the impairment language of Section 1124(1) "and in that sense more explicitly addresses the insurers' voting argument," this Court explained that, for purposes of the ***appellate standing*** question before it (as distinct from the ***bankruptcy standing*** question before the bankruptcy court), "the question is not whether the Plan impaired the ***claims*** of insurers," but whether it "diminishes their property, increases their burdens, or impairs their *rights*." *Id.* at 218 (emphasis added; internal quotation omitted).

This Court then found that "[a]s originally drafted, the super-preemptory provision made clear that any pre-petition contractual rights remained unaltered[.]" *Id.* However, "by limiting the scope of the super-preemptory provision only to 'claims' and not to broader 'rights,' the

District Court exposed the Objecting Insurers" to a potential impairment of their contractual rights.  As this Court further explained:

> Although the District Court found that "***all substantive rights of the insurers were expressly preserved*** under the Plan per the order of" the Bankruptcy Court, it nevertheless altered the language of the provision in a manner the insurers claim was ***adverse to their rights***.  We agree with the insurers on this point.

*Id.* (emphasis added).

Accordingly, this Court held that "the Objecting Insurers have [appellate] standing to challenge this modification."  *Id.*  Importantly, however, after concluding that the insurers had appellate standing, the Court went further, expressly vacating the district court's modification of the super-preemptory provision and "restoring the [super-preemptory] provision as drafted by the Bankruptcy Court."  *Id.*

This outcome—reinstating the bankruptcy court's original language because the district court's modification violated the insurers' rights—simply cannot be reconciled with the bankruptcy and district courts' determination in this case that insurance neutrality is a mere standing concept and is not a requirement for plan confirmation.  Were that the case, in *Combustion Engineering*, this Court would have simply

38

held that insurers had appellate standing and left it at that, declining to take the additional step of restoring the super-preemptory provision added to the plan by the bankruptcy court. *See Global Indus.*, 645 F.3d at 209 n.23 (noting that appellate standing is "standing to appeal the ***substance*** of the bankruptcy court's decision") (emphasis added)). By taking the additional step, this Court also correctly applied the principle—later confirmed by the Supreme Court's decision in *Tempnology*—that non-abrogation of contractual rights is a fundamental requirement of bankruptcy law. 139 S. Ct. at 1663.

In *Global Industrial*, this Court, sitting *en banc*, revisited the *Combustion Engineering* decision and recognized the importance of insurance neutrality. 645 F.3d at 211. The majority, comprised of six judges, found that despite the plan's inclusion of the same broad "insurance neutrality" language at issue in *Combustion Engineering*, the insurers had nonetheless established bankruptcy standing given that the plan "staggeringly increased" the debtors' pre-petition liability exposure, thereby potentially impairing the insurers' contractual rights, entitling the insurers to demonstrate to the bankruptcy court that the increase was the product of collusion. *Id.* at 212. Although the four-judge dissent

disagreed and concluded that the insurers did not have bankruptcy standing, it did so expressly on the basis that the plan's use of the same broad "insurance-neutrality" language recognized by *Combustion Engineering* was sufficient to preserve the insurers' rights and disagreed with the insurers' argument that they had not been given an adequate opportunity to demonstrate collusion to the bankruptcy court. *Id.* at 218 (noting that, because the plan included explicit insurance neutrality provisions, the insurers "have the same full range of contractual rights to protect their interests for which they bargained at the inception of the insurance contracts pre-petition"). Thus, the majority and dissenting opinions both endorsed a plan that includes broad insurance neutrality protections like those ordered by this Court in *Combustion Engineering* (and sought by the Certain Insurers here) as critical to effectively preserving insurers' contractual rights. *Id.* at 215, 218-19.

The Certain Insurers ask this Court to include in the Plan the same sort of insurance-neutral provisions that were integral to the *Combustion Engineering* holding. By doing so, the Court will ensure that the Certain Insurers continue to have the same full range of contractual rights to

protect their interests for which they bargained at the inception of the insurance contracts.

>    2.    The Plan Language Purporting To Preserve the Certain Insurers' Rights Undermines Them.

Because of the errors below, this Plan purports to transfer BSA's insurance-related rights without its insurance-related obligations and lacks the critical language required by this Court to preserve the Certain Insurers' pre-petition rights. *See Combustion Eng'g*, 391 F.3d at 217. The Certain Insurers' contractual rights are crucial: they include defense rights, such as the right to associate in the defense and investigate claims; cooperation obligations requiring the insured to assist and cooperate in the insurers' investigation; consent-to-settlement rights; express coverage terms and exclusions even though a claim may be valid against the policyholder; and arbitration clauses. (*Supra* at 11-12.) These rights are fundamental to the "bargain" struck between BSA and the Certain Insurers and contained in the insurance contracts. (*Id.*) But none of these rights are recognized anywhere in the Plan.

At the same time, the Trustee filed an action in federal court against the Certain Insurers arguing, however erroneously, that the Certain Insurers' contractual rights and BSA's obligations with respect

to abuse claims, ordinarily governed by state law, are now abrogated by the confirmed Plan.  (Compl. ¶¶ 119, 121, 124, 137, *Trustee of the BSA Settlement Tr. v. Allianz Global Risks US Ins. Co.,* 3:23-cv-01592, Dkt. No. 1 (N.D. Tex. July 17, 2023) (the "Coverage Complaint").)[4]

The Plan itself provides that the Certain Insurers' rights and BSA's obligations are "subject to the Plan and Confirmation Order" and preserved only "to the extent such rights and obligations are otherwise available under applicable law."  (A. 1017 (TDPs, Art. V.C).)  In other words, the Plan preserves such rights ***to the extent it does not take them away***—a preservation that is, at best, circular and, at worst, illusory.

That the Plan, on its face, fails to preserve the Certain Insurers' rights is no accident: it is what remains of the concerted effort before and at the confirmation hearing, by BSA and the claimants' attorneys, to achieve the "holy grail" of making claim valuations binding on non-

---

[4]  The Certain Insurers request that the Court take judicial notice of the filing of the Coverage Complaint because it is a fact that is not subject to reasonable dispute and the Certain Insurers are offering it for the fact of its filing and not for the truth of the allegations therein.  Fed. R. Evid. 201(b), (d); *see Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 151 (3d Cir. 1973).

settling insurers notwithstanding their ability to "assert" contractual rights in coverage litigation.  (A. 23753-23761; *see* A. 4708-4709 (Amala).)

Through the newly-filed coverage action, the Trustee has continued to make good on that effort.  The Coverage Complaint seeks a declaration that the Certain Insurers have breached the insurance policies and are obligated to provide full coverage for the Abuse Claims, alleging that the Trustee received the benefit of the insurance policies, but makes no mention of the Certain Insurers' rights or defenses under the policies or the Trustee's corresponding obligations, which the courts below said were preserved.  (*See* Compl. ¶¶ 110, 137.)  Furthermore, in a section entitled "Defendants' Involvement in the Bankruptcy Proceedings," the Coverage Complaint seeks to impair or eliminate the Certain Insurers' rights and defenses as a result of the purported resolution of coverage issues in the bankruptcy proceeding.  Specifically, the Trustee alleges that the Certain Insurers contended in the bankruptcy proceeding that "they had no obligation to cover Abuse Claims because of the terms of their Insurance Policies."  (Compl. ¶ 131.)  In the next sentence, the Trustee states that "the Bankruptcy Court and the District Court rejected Defendants' arguments that the Plan unlawfully impaired their rights under the

Insurance Policies" (*id.*), arguing that the Certain Insurers' coverage defenses were considered and rejected by the courts below.

While the Certain Insurers did not argue before the bankruptcy court that they had no obligation to cover the Abuse Claims—that is among the issues the coverage court itself must resolve under state law based on the terms of the policies—and the bankruptcy court did not resolve the issue of coverage, the import of the Complaint is clear: the Certain Insurers should be collaterally estopped from arguing that they are not obligated to cover all 82,000 Claims by virtue of their participation in the bankruptcy proceeding. Indeed, the Trustee alleges that the Certain Insurers are precluded from raising and relying upon conditions precedent and exclusions and defenses under the policies. (Compl. ¶ 121.) Taken together, these allegations read into the Plan the very anti-insurer findings the bankruptcy court rejected and attempt to use the bankruptcy process to impair the Certain Insurers' contractual rights in subsequent coverage litigation, underscoring the need for this Plan to include the requested changes, including the language prohibiting the application of *res judicata* and collateral

estoppel against the Certain Insurers as a result of their involvement in the bankruptcy proceedings.

This development, while contrary to Third Circuit precedent, is not surprising.  When pressed repeatedly at oral argument before the district court, claimants' counsel ***refused to accept*** that the Plan preserves rights and obligations under the Certain Insurers' contracts.  (A. 19902-19903 ("I would not say that all of the rights and obligations were transferred to this Settlement Trust.").)

The district court brushed aside the Certain Insurers' concerns and concluded that the "subject to" language is "clear" in preserving insurers' rights.  (A. 117.)  Specifically, the district court found:

> The plain meaning of this provision is clear that Insurers' rights and obligations under an Insurance Policy are preserved "to the extent such rights and obligations are otherwise available under applicable law."  Thus, Insurers keep the whole gamut of permissible contractual rights under state law except, for example, anti-assignment provisions that are not "otherwise available" under the Bankruptcy Code.  Similarly, Insurers' rights and obligations under an Insurance Policy are preserved "subject to the Plan and Confirmation Order," which, for example, assign rights under Policies to the Litigation Trust—an assignment not otherwise contemplate [sic] or authorized by the Policies.

(*Id.*)

That conclusion was erroneous at the time and is further belied by the Coverage Complaint. Moreover, the district court ignored the fact that this Plan, in rendering the Certain Insurers' rights "subject to" the Plan, actually says the ***opposite*** of what the plan said in *Combustion Engineering*, which expressly provided, "Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan, or the Plan documents . . . shall in any way operate to, or have the effect of, impairing the insurers' legal, equitable, or contractual rights[.]" 391 F.3d at 212. And while the district court found that the Plan is "clear" in preserving the Certain Insurers' contract rights—a holding that will be important to the Certain Insurers in the coverage litigation—the district court decision introduces ambiguity that should not exist. As quoted above, the district court found that "Insurers keep the whole gamut of permissible contractual rights under state law except, ***for example***, anti-assignment provisions that are not 'otherwise available' under the Bankruptcy Code." (A. 117 (emphasis added).) But just as with the Plan's circular language, the

exceptions swallow the rule: there is no limit to "examples" of rights and obligations that the Trustee may argue have been abrogated by this Plan.

Indeed, with respect to the Plan's impact on insurance coverage litigation, the courts below did precisely the opposite of what Third Circuit law requires. They contemplated that the Certain Insurers *may be bound* by the awards issued by the Trust depending on how the coverage courts interpret the Plan, TDPs, and confirmation order. (*See* A. 175 (noting that "the Bankruptcy Court held that Certain Insurers *would not necessarily be bound* by the awards issued by the Settlement Trust"); A. 744 ("I will not anticipate *how an insurance coverage court will interpret the Plan, the TDP or any confirmation order* that may be entered.") (emphasis added).) The Trustee is now leveraging this ambiguity by seeking a declaration that, based on the bankruptcy proceedings and the Plan, the Certain Insurers are *obligated* to provide coverage in full for Abuse Claims, subject only to applicable attachment points and limits of liability. (Compl. ¶ 137.) Third Circuit law requires the opposite: that the Certain Insurers *may not* be bound by the awards issued by the Trust, if their rights are not

honored. And federal courts must include language in this Plan that guarantees that result. *See Combustion Eng'g*, 391 F.3d at 217.

### 3. The Protective Language Originally Proposed by BSA Must Be Added Back to the Plan.

The Plan must therefore include a clear directive that the Certain Insurers' coverage defenses will not be adversely affected by anything in the Plan or anything that took place in the bankruptcy proceedings more generally. The Plan as initially proposed said as much. (*See e.g.*, A. 7708-7711 (TDPs, Arts. 2.1, 7.2. 10.1).) For example, BSA initially drafted the TDPs to protect the Certain Insurers' rights by including Article 7.2, which specified that nothing in the TDPs "shall affect, impair, or prejudice the rights and defenses of the Non-Settling Insurance Companies in any manner." (*See supra* at 15.) While BSA's motivation to cap its own liability and garner the support of abuse claimants to exit bankruptcy may be understandable, it cannot do so at the expense of the Certain Insurers' contractual rights. The draft TDPs also included a sentence in Article 10.1, which stated that notwithstanding the TDPs, a decision by the Trust to pay (or not pay) any claim would not be admissible against the Certain Insurers or otherwise have any *res judicata*, collateral estoppel, or preclusive effect. (*See supra* at 15.)

48

Neither provision, however, ended up in the final version of the TDPs. (*See supra* at 17-18).[5]

This omission renders the Plan atypical among mass tort bankruptcies. Insurer protective provisions of the sort proposed—but rejected here—are common features in such bankruptcies, including more recent bankruptcies involving sexual abuse claims. Typically, they subject the plan to the insurers' contract rights, ***not*** the insurers' contract rights to the plan. *See, e.g.*, First Amended Joint Plan of Reorganization, Art. 7.15, ECF No. 24657, No. 01-01139, *In re W.R. Grace & Co.*, 446 B.R. 96 (Bankr. D. Del. 2011), *aff'd*, 729 F.3d 311 (3d Cir. 2013) (no plan or plan document provision other than the insurance neutrality section shall in any way operate to, or have the effect of, impairing any Asbestos Insurance Entity's legal, equitable or contractual rights, if any, in any respect). And they commonly specify that a trustee's claim determinations have no preclusive effect on the insurers. *See, e.g.*,

---

[5] On a multitude of different topics, the Plan provides "belt-and-suspenders" type provisos making clear that ***other affected parties'*** rights are preserved. (*See, e.g.*, A. 1014 (TDPs, Art. IV.A.iii); 1044 (TDPs, Art. XIV.A); *see* A. 2250 (Azer) ("We were just trying to use this belt-and-suspenders approach to preserve the contractual rights throughout the provision—throughout the TDP.").) Not so for the Certain Insurers.

Fourth Amended Joint Plan of Reorganization, § 10.4.1.2, ECF No. 13660, *In re Fed.-Mogul Glob. Inc.*, No. 01-10578 (JFK), 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007), *aff'd*, 684 F.3d 355 (3d Cir. 2012) (no preclusion as to liability, reasonableness of TDPs, consistency with pre-petition procedures, reasonableness of settlement or value, participation or consent of insurers, suffering of an insured loss, or liability or value of the claims).[6]

---

[6] *See also* Amended Composite Plan, Art. 4.4, *In re Global Indus. Techs., Inc.*, 645 F.3d 201 (3rd Cir. 2011), *cert. denied*, 565 U.S. 1014 (2011), *remanded to* No. 02-21626 (JKF), 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013), ECF No. 10844 (confirming plan containing neutrality provisions preserving all rights, claims and defenses of insurers' under relevant policies and preventing use of issue or claim preclusion regarding treatment of claims by trust); Plan of Reorganization, as Modified through August 3, 2005, Art. 3.2.4.4, No. 03-10495, *Combustion Eng'g*, 391 F.3d 190, ECF No. 2368 (reversing plan confirmation and reinstating super-preemptory insurance neutrality provision stating that plan shall not operate to or have the effect of impairing insurers' rights, which shall be determined under the policies); Modified Fourth Amended Joint Plan of Reorganization, Art. 6.W.9, No. 20-12522, *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022), ECF No. 7670 (adding language stating plan and any bankruptcy court ruling shall not constitute a determination as to particular coverage issues, which shall be resolved pursuant to the policies and applicable law in subsequent litigation, with all rights preserved).

4.    The Relief Sought by the Certain Insurers Does Not Require Unraveling the Plan.

The relief sought by the Certain Insurers—deleting the "subject to" provision, assigning the policies in their entirety, and adding back certain protective language that BSA proposed and then removed—can be ordered without reversing other aspects of the Plan. *See Combustion Eng'g*, 391 F.3d at 218 (modifying language in super-preemptory provision to broaden reservation of insurers' rights to include not only "claims" but "rights"). Indeed, the district court agreed that "upon a successful appeal" it was "conceivable that relief might be fashioned— such as requiring the transfer of the entire policies—that would not unravel the entire Plan." (A. 20334.)

In *In re PWS Holding Corp.*, this Court recognized that an appeal challenging certain third-party rights did not require unraveling the entire plan because the relevant language "could be stricken from the plan without undoing other portions of it." 228 F.3d 224, 236 (3d Cir. 2000). Because the relief sought here does not implicate any aspects of the plan that have already been consummated, but simply preserves the Certain Insurers' rights, these revisions do not "fatally scramble the plan," nor do they "significantly harm third parties who have justifiably

51

relied on plan confirmation." *In re Tribune Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015). They simply conform the Plan to the law and make express what the bankruptcy court and district court stated was already implicit in, and yet clearly missing from, the Plan: the Certain Insurers' contractual rights have been preserved.[7]

II.    The Plan Approved at Confirmation Was Not Proposed by BSA in Good Faith in Its Treatment of the Certain Insurers.

BSA was required to propose a plan "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is an equitable concept, rooted in the promise of treatment that is "fair to rights and interests of the parties affected" by a bankruptcy reorganization. *SGL Carbon,* 200 F.3d at 161 (internal quotations omitted); *see LTL*, 64 F.4th at 100 (good faith requirement is "grounded . . . in the equitable nature of bankruptcy"); *Am. Cap. Equip.*, 688 F.3d at 157 (good faith requires "fundamental fairness and justice"); *In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004) ("[T]he most important feature" of the good faith analysis is "an inquiry into the

---

[7] The Certain Insurers join the Opening Brief on Appeal of the Allianz Insurers.

'fundamental fairness' of the plan.") (quoting *In re Coram Healthcare Corporation,* 271 B.R. 228, 234 (Bankr. D. Del. 2001)).

Assessing the good faith standard requires examining the terms of the plan and the totality of the circumstances surrounding its proposal. *Am. United Mut. Life Ins. Co. v. City of Avon Park*, *Fla.*, 311 U.S. 138, 145-46 (1940) (good faith requirement imposes a "responsibility" on the court to "scrutin[ize] the circumstances surrounding" plan negotiations); *see, e.g.*, *Am. Cap. Equip.*, 688 F.3d at 156 ("the important point of inquiry is the plan itself"); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (Bankr. D. Del. 2012) (determining good faith "requires a factual inquiry into the totality of the circumstances surrounding the plan's proposal"); *Coram Healthcare Corp.*, 271 B.R. at 234 (same).

The debtor bears the burden of proving good faith, and this Court examines *de novo* a lower court's ultimate determination of good faith: "[T]he culminating determination of whether [the] findings support a conclusion of good faith gets plenary review as 'essentially[] a conclusion of law.'" *LTL*, 64 F. 4th at 100; *see 15375 Mem'l Corp.*, 589 F.3d at 616.

A.  <u>The Bankruptcy Court Failed to Properly Consider the Interests of the Certain Insurers</u>.

The Bankruptcy Court was required to consider and weigh the interests of the Certain Insurers along with the other interested parties in determining whether the Plan was proposed in good faith. *See Am. Cap. Equip.*, 688 F.3d at 164; *see also In re Fed.-Mogul Glob. Inc.*, 684 F.3d at 361-62 (noting "profoundly serious" concerns raised when a debtor has "sold out [its] insurers") (quoting *Global Indus.*, 645 F. 3d at 214). In *American Capital*, for example, this Court evaluated the impact the proposed plan had on the debtors' insurers and concluded that the plan did not meet the statutory good faith test. 688 F.3d at 156. The Court specifically found that the plan's funding process, among other things, improperly "strip[ped] Insurers of certain procedural and substantive rights." *Id.* at 160.

While the courts below focused on the Plan's rehabilitation of BSA and compensation for abuse victims (A. 166-169, 676-677), these worthy goals do not, by themselves, satisfy the good faith requirement. Because BSA failed to protect the rights of the Certain Insurers as participants fully entitled to good faith treatment under the Plan, the courts below committed reversible error. In *American Capital*, for example, this Court

rejected the debtors' argument "that their plan is not in bad faith because it fulfills a purpose of the Bankruptcy Code (namely, maximizing value to creditors)." *Id.* at 163 n. 8.  The Court held:

> [T]he fact that there is at least one valid purpose to the Plan is not dispositive as the Plan could fulfill one specific purpose of the Code and yet be inconsistent with other overarching principles, or with the requirement that objectives and purposes of the Code must be fairly achieved.

*Id.* at 160 n.8.  The Court reiterated this principle most recently in *LTL*, explaining, "Good intentions—such as to protect [the Debtor's] brand or comprehensively resolve litigation—do not suffice alone [to establish good faith]."  64 F. 4th at 93.

A court of equity must also protect the rights of parties swept into a bankruptcy proceeding, including insurers.  *See SGL Carbon*, 200 F.3d at 162; *Am. Cap. Equip.*, 688 F.3d at 164.  This is especially true in mass tort cases like this one:  "an extraordinary" and "emotionally charged" case involving a "lionized institution."  (A. 507.)  Emotions must not trump either the rule of law or the Bankruptcy Code's commitment to treat all affected parties fairly and equitably.  *See, e.g.*, *LTL*, 64 F. 4th at 100 (finding lack of good faith notwithstanding that bankruptcy stemmed from an intent to compensate victims).

B.    <u>The Plan Was Not Proposed in Good Faith as to the Certain Insurers</u>.

The Plan was not developed and proposed in good faith with respect to the Certain Insurers.  In an earlier proposed plan, BSA expressly noted that the rights of the Certain Insurers were entitled to equal weight and consideration by the Trustee, along with the other constituents, in the administration of the Trust.  Section 2.1 set out the "Purpose" of the Settlement Trust:

> The Trust Distribution Procedures are intended to balance the interests of Reorganized BSA and the other Protected Parties, holders of Abuse Claims, and the Non-Settling Insurance Companies.

Following negotiations among BSA and claimants' representatives (the Coalition, the STAC, and the FCR), the result of which was an agreement that limited BSA's contribution to the Trust, the proposed terms of the plan changed drastically, reflecting a clear bias against the Certain Insurers and the goal to improperly expand the insurers' obligations in the post-bankruptcy environment.  (*Supra* at 15-19.) Specifically, the next proposed plan dropped the protective term that had been included in the "Purpose" provision moving forward.  BSA also included the blatantly improper findings that were designed to bind the Certain Insurers to any determination by the Trustee to pay claimants,

without regard to the contractual rights and coverage defenses afforded under the subject insurance policies. (*See supra* at 18-19.) While the bankruptcy court struck these findings, it nonetheless approved a Plan that purports to impair the Certain Insurers' rights and refused to recognize that the interests of the Certain Insurers must be considered and respected in balancing the rights of all parties affected by the Plan.

C.    The Plan Creates a Moral Hazard that Must Be Addressed to Meet the Good Faith Requirement.

It is especially important to scrutinize the process leading up to the plan proposal because the Plan dramatically changes the relationship between BSA and its remaining insurers to the detriment of the Certain Insurers. Before the bankruptcy filing, BSA and its insurers were aligned in defending claims, as typically is the case between a policyholder and its insurers, with incentives to limit losses, evaluate and test allegations, and collaborate in litigating or settling claims.

Under the Plan, however, that alignment, including the reciprocal duties to act towards one another in good faith, has been voided. The Trustee is now a fiduciary for all holders of Abuse Claims and is duty-bound to resolve and pay all claims pursuant to the TDPs (A. 1021 (TDPs, Art. VII.D), even though the TDPs materially lessen the evidentiary

requirements and legal hurdles (including statute of limitations defenses) that claimants would otherwise have to overcome in the tort system. While the Trustee may "consider any further limitation on Abuse Claimants' recovery in the tort system" when valuing claims (A. 1029 (TDPs, Art. VIII.D.ii)), and vigorously contest claims as BSA did in the tort system, the Plan does not by its terms require that the Trustee do so.[8]

That is particularly troubling here because, unlike BSA's experience before the bankruptcy, approximately sixty-five percent of claims are from claimants in states where a statute of limitations or repose renders the claim untimely. (A. 1693-1695, 1700-1701 (Griggs), 2684 (Murray), 4424 (Stern); *see* A. 23701.) Further, experts on both sides testified that a significant portion of the claims are likely "fraudulent." (A. 3941-3942 (Conte), 4157 (Treacy); *see* A. 4154-4155 (Treacy) (forty to forty-five percent of such allegations are generally unreliable); 2685-2686 (Murray) (ninety percent or more of claimants

---

[8] This discretionary language stands in stark contrast to many provisions requiring the Trustee to act in the interests of claimants, the STAC and the FCR. (*See, e.g.*, A. 1107-1108, 1115-1116 (STA §§ 5.2(c), 5.3, 5.13, 5.14).)

never reported abuse to scouting or law enforcement).)  And BSA's own expert, Dr. Charles Bates, admitted that the Trustee would need to scale down the Base Matrix Values for certain claims *by approximately ninety percent* to render claim awards consistent with BSA's historical litigation outcomes.  (A. 2941 (Bates).)

In addition, there was a massive explosion of claims against BSA following the bankruptcy filing, the false and misleading advertising campaign by a group of claimants' counsel, and the establishment of bar date for the filing of claims, which dramatically increased BSA's pre-petition liability.  *See, e.g.*, *Global Indus.*, 645 F. 3d at 212 (en banc) (noting the number of claims "staggeringly increased—by more than 27 times—the pre-petition liability").  Courts have recognized the proliferation of claims, even dubious ones, can result in substantial pressure to settle, even if the defendants have meritorious defenses.  *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189 (1994) ("Because of the uncertainty of the governing rules, entities . . . may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay settlements in order to avoid the expense and risk of going to trial."); *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 559 (2007) (noting that "the threat of discovery expense will push cost-conscious defendants to settle even anemic cases"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001) (describing the "hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability").

The courts below both found that the explosion of claims ***alone*** does not demonstrate an absence of good faith in the Plan. (A. 737-738, 185-186.) But the Certain Insurers are making no such claim. It is the totality of the circumstances that demonstrates that the Plan was not proposed in good faith. *See Am. United Mut. Life*, 311 U.S. at 145-46. And one indisputable fact is that, following the establishment of the bar date, the number of claims ***increased 50-fold*** compared to BSA's pre-petition experience, and BSA needed a supermajority of those 80,000 new claimants to vote for its Plan. Thus, the process significantly increased the Certain Insurers' liability exposure, irrespective of the reasons for the explosion of claims, and underscores their need for, and entitlement to secure in the Plan itself, clear language that recognizes, preserves, and

protects the full array of the Certain Insurers' rights and defenses under the policies.

The combination of all these factors creates the very conflict of interest and moral hazard that must be addressed for a plan to be proposed in good faith. The bankruptcy court recognized that "a moral hazard is the possibility that an insured, once the insurance company is paying for claims or losses . . . may have less incentive to prevent loss or less incentive to limit the size of losses or claims once they occur." (A. 739.) Both courts recognized that insurers' contractual defenses are important to protect against a conflict of interest with insureds in the ordinary, non-bankruptcy setting. (*See* A. 739 ("Professor Harrington testified, generally (and within his expertise), to four key clauses in CGL (commercial general liability) policies that help reduce a 'moral hazard' and permit insurers to offer coverage at lower premiums thereby encouraging the 'take-up' off liability insurance in the business community."); A. 118 (positively referencing testimony regarding commercial general liability policy clauses that help reduce "moral hazard").) But the Plan and TDPs—for all the reasons summarized above—dramatically increase the Trustee's conflict of interest with BSA's

insurers, which necessitates express and unambiguous language in the Plan that (1) the Certain Insurers' contractual rights are preserved and unaltered and that BSA's contractual obligations are fully transferred to the Trust notwithstanding anything in the Plan, the TDPs or the Confirmation Order; (2) the principles of *res judicata* and collateral estoppel arising from the bankruptcy proceedings do not limit or alter the insurers' defenses or the Trust's obligations under the policies, and (3) in administering the Trust, the Trustee must balance the interests of the insurers along with those of the Trust, affected parties, and the claimants, all as originally proposed by BSA below.

Otherwise, this moral hazard and conflict of interest, left unaddressed, preclude a proposal in good faith. In *American Capital*, this Court found that (1) the plan provided for tort claims to be paid by a trust funded by an assignment of insurance; (2) the claims would be resolved according to procedures that gave decision-makers "financial[] incentiv[es] to sabotage [the debtor's] own defense" and maximize the claims insurers would be asked to pay; (3) the TDPs would "severely limit[] or eliminat[e] Insurers' ability to take discovery, submit evidence, contest causation, or appeal a decision," and otherwise "strip[] Insurers

of [their] procedural and substantive rights"; and (4) the case was unlike other bankruptcy cases, where a trust is typically funded by ongoing debtor contributions. 688 F.3d at 150, 158-61. Even where there was no "collusion" between the debtor and claimants, the Court concluded that the plan was "patently unconfirmable" for lack of good faith because of its treatment of insurers. *Id.* at 161.[9] So too here—the Plan's treatment of insurers demonstrates that the Plan was not proposed in good faith.

Remedying the Plan's lack of good faith does not require unscrambling the Plan, remanding the case for more fact-finding, or disturbing the mechanisms for compensating abuse claimants. First, as noted in Point I, the Court should modify the Plan to eliminate the language in Article V.C of the TDPs that makes the Certain Insurers'

---

[9] Unlike in this case, the plan in *American Capital* was funded in large part by a surcharge taken from asbestos claimants who received compensation under the plan. This surcharge created a financial incentive for the reorganized debtor to minimize its own defenses against those claimants, whose compensation would trigger potential insurance coverage. Nonetheless, this Court recognized that: 1) the impact that a plan has on insurers must be considered in evaluating good faith, even in the absence of collusion between the debtor and claimants; and 2) the courts must consider potential conflicts of interest between the debtors' successor-in-interest and its insurers, particularly where insurer contributions as opposed to the ongoing business of the reorganized debtor are the source for future funding of the plan. *Id.* at 158-61.

rights "subject to the Plan and the Confirmation Order," make clear that the policies are assigned in their entirety, and add the two provisions that BSA initially proposed to preserve and protect the Certain Insurers' contractual rights. Second, this Court should restore the "Purpose" provision language that recognizes the Trustee's obligation to balance the rights of the Certain Insurers along with reorganized BSA, the other Protected Parties, and the Abuse Victims in administering the Trust. Third, in setting claimants' compensation, the Trustee should be *required* to "consider any further limitation on Abuse Claimants' recovery in the tort system," including the limitation expressly identified by BSA's expert. (*See* A. 1029 (TDPs, Art. VIII.D.ii).)

Although these straightforward changes may not remedy every defect in the Plan, they will provide the Certain Insurers with meaningful relief. Such changes would help restore the contractual relationship between BSA and its insurers, protect the bargained-for rights and coverage defenses of the Certain Insurers, and serve the goals of the Bankruptcy Code to reorganize BSA and compensate its claimants, as required under Section 1129(a)(3).

# CONCLUSION

For the foregoing reasons, the Court should reverse and order the requested modifications to the Plan.

Dated:      July 24, 2023

Respectfully submitted,

By: /s/ Theodore J. Boutrous Jr.

Deirdre M. Richards
FINEMAN KREKSTEIN
& HARRIS PC
1300 N. King Street
Wilmington, DE 19801
Telephone: (302) 538-8331
Facsimile: (302) 394-9228
drichards@finemanlawfirm.com

Theodore J. Boutrous Jr.
Blaine H. Evanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com
bevanson@gibsondunn.com

Susan N.K. Gummow
FORAN GLENNON
PALANDECH PONZI &
RUDLOFF P.C.
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
sgummow@fgppr.com

Michael A. Rosenthal
James Hallowell
Seth M. Rokosky
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
mrosenthal@gibsondunn.com
jhallowell@gibsondunn.com
kmartorana@gibsondunn.com
srokosky@gibsondunn.com

*Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

Joseph T. Baio
Christopher J. St. Jeanos
Mitchell J. Auslander
Charles Dean Cording
Patricia O. Haynes
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Additional Counsel for National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

/s/ Ronald P. Schiller
Ronald P. Schiller
Matthew A. Hamermesh
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Telephone: (215) 568-6200
E: rschiller@hangley.com
mhamermesh@hangley.com

Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

*Counsel for Arch Insurance
Company*

/s/ Michael J. Joyce
Michael J. Joyce
JOYCE, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 388-1944
Email:  mjoyce@mjlawoffices.com

Kevin Coughlin
Lorraine Armenti
Michael Hrinewski
COUGHLIN MIDLIGE &
GARLAND, LLP

By:  /s/ Kathleen K. Kerns
POST & SCHELL, P.C.
Kathleen K. Kerns
Four Penn Center – 13th Floor
1600 John F. Kennedy Boulevard
Philadelphia, PA  19103
Telephone: (215) 587-1000
E-mail: kkerns@postschell.com

IFRAH PLLC
George R. Calhoun
1717 Pennsylvania Ave., N.W.
Suite 650
Washington, DC  20006
Phone:  (202) 840-8758
E-mail:  george@ifrahlaw.com

*Counsel for Argonaut Insurance
Company and Colony Insurance
Company*

/s/ Maria Aprile Saczuk
Maria Aprile Sawczuk, Esq.
GOLDSTEIN & MCCLINTOCK
LLLP
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

Laura McNally, Esq.
LOEB & LOEB LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
Telephone: (312) 464-3155

350 Mount Kemble Avenue, PO
Box 1917
Morristown, NJ 07962
Telephone:  (973) 267-0058
kcoughlin@cmg.law
larmenti@cmg.law
mhrinewski@cmg.law

John M. Flynn
Britton C. Lewis
CARRUTHERS & ROTH, P.A.
235 N. Edgeworth Street
P.O. Box 540
Greensboro, NC  27401
Telephone:  (336) 478-1146
jmf@crlaw.com
bcl@crlaw.com

*Counsel for Arrowood
Indemnity Company*

/s/ William H. White Jr.
William H. White Jr
KIERNAN TREBACH LLP
1233 20th Street, NW, 8th Floor
Washington, DC 20036
Telephone: (202) 712-7000
Email:
wwhite@kiernantrebach.com

John E.W. Baay II
GIEGER LABORDE &
LAPEROUOSE, LLC
701 Poydras Street
Suite 4800
New Orleans, LA 70139

lmcnally@loeb.com

David Christian, Esq.
DAVID CHRISTIAN ATTORNEYS
LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

*Counsel for Continental Insurance
Company and Columbia Casualty
Company*

/s/ Kathleen M. Miller
Kathleen M. Miller
SMITH, KATZENSTEIN &
JENKINS LLP
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
Email: kmiller@skjlaw.com

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
WILEY REIN LLP
2050 M Street NW

Telephone: (504) 561-0400

*Counsel for Gemini Insurance Company*

/s/ Konrad R. Krebs
Konrad R. Krebs
CLYDE & CO US LLP
340 Mt. Kemble Ave, Suite 300
Morristown, New Jersey 07960
Telephone: (973) 210-6705
konrad.krebs@clydeco.us

Alexander E. Potente
CLYDE & CO US LLP
150 California Street
15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
alex.potente@clydeco.us

David Christian
DAVID CHRISTIAN ATTORNEYS LLC
105 W. Madison St., Suite 1400
Chicago, Illinois 60602
Telephone: (312) 282-5282
dchristian@dca.law

Bruce W. McCullough
BODELL BOVE, LLC
1225 N. King St., Suite 1000
Wilmington, DE 19801-3250
Telephone: (302) 655-6749

Washington, DC 20036
Phone: (202) 719-7000
Email: mborja@wiley.law
gseligman@wiley.law
acriss@wiley.law

*Counsel for General Star Indemnity Company*

/s/ Kathleen M. Miller
SMITH, KATZENSTEIN & JENKINS LLP
Kathleen M. Miller
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

MOUND COTTON WOLLAN & GREENGRASS LLP
Lloyd A. Gura
Pamela J. Minetto
One New York Plaza 44th Floor
New York, NY 10004
Telephone: (212) 804-4282
Email: lgura@moundcotton.com
pminetto@moundcotton.com

*Counsel for Indian Harbor Insurance Company, on behalf of itself and as successor in interest to Catlin Specialty Insurance Company*

69

bmccullough@bodellbove.com

*Counsel for Great American
Assurance Company f/k/a
Agricultural Insurance Company,
Great American E&S Insurance
Company f/k/a Agricultural
Excess and Surplus Insurance
Company, and Great American
E&S Insurance Company*

/s/ Douglas R. Gooding
Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
CHOATE, HALL & STEWART
LLP
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com
bmcgillycuddy@choate.com

Kim V. Marrkand
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO PC
One Financial Center
Boston, MA 02111
Telephone: (617) 542-6000
kvmarrkand@mintz.com

R. Karl Hill
SEITZ, VAN OGTROP & GREEN,
P.A.
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-0600

/s/ Marla S. Benedek
Marla S. Benedek
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
Telephone: (302) 295-2024
mbenedek@cozen.com

*Counsel for Traders and Pacific
Insurance Company, Endurance
American Specialty Insurance
Company, and Endurance
American Insurance Company*

/s/ Louis J. Rizzo, Jr.
Louis J. Rizzo, Jr.
REGER RIZZO & DARNALL LLP
1521 Concord Pike Suite 305
Brandywine Plaza West
Wilmington DE 19803
Telephone: (302) 477-7100
lrizzo@regerlaw.com

*Counsel for Travelers Casualty and
Surety Company, Inc. (f/k/a Aetna
Casualty & Surety Company), St.
Paul Surplus Lines Insurance*

khill@svglaw.com

*Counsel to Liberty Mutual*
*Insurance Company, The Ohio*
*Casualty Insurance Company,*
*Liberty Insurance Underwriters,*
*Inc., and Liberty Surplus Insurance*
*Corporation*

*/s/ Stephen M. Miller*
Stephen M. Miller (DE ID No. 2610)
Carl N. Kunz, III (DE ID No. 3201)
MORRIS JAMES LLP
500 Delaware Avenue, Ste. 1500
Wilmington, DE  19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
Email: smiller@morrisjames.com
Email: ckunz@morrisjames.com

*Counsel for Old Republic Insurance*
*Company*

*Company and Gulf Insurance*
*Company*

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, Theodore J. Boutrous Jr., am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:     July 24, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with word limitations of Fed. R. App. P. 32(a) because it contains 12,925 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because CrowdStrike Falcon was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:    July 24, 2023

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on July 24, 2023. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
tboutrous@gibsondunn.com

Dated:     July 24, 2023